Ms. O'Keefe, would you announce our second case for argument? 21-3833, District of Minnesota, Allen Beaulieu v. Clint Stockwell, et al. Good morning, your honors. May it please the court. Gabriel Gillette from General & Block, representing Plaintiff Allen Beaulieu. Allen photographed the legendary artist Prince early in his career and sought to create a book using those one-of-a-kind photos. This case centers on defendant's misconduct arising from the failure of that book project. I want to focus today on two claims in this case where the district court erroneously granted summary judgment. The first claim is conversion. Under Minnesota law, conversion occurs when there is unauthorized dominion over property permanently or for an indefinite period. The undisputed record here shows that's what happened. Allen gave defendant Stockwell his photos to be copied for two weeks in May of 2016, and Mr. Stockwell repeatedly refused to return any photos at all until October of 2016. Counsel, was that claim raised in the district court? Yes, it was, your honor. It's pled in the complaint. It's pled in the amended complaint, excuse me. It's raised at summary judgment, and we've been clear throughout that our conversion claim has both components to it. The, what I'll call the May to October conversion theory, as well as the continued conversion theory. I'm referring to, I think, what was called the technical conversion theory. Right, and I want to be clear. Minnesota law doesn't distinguish between types of conversion. Here we have conversion in two different ways. The first way is from May to October of 2016. In May, Mr. Bolio gave his photos to Mr. Stockwell. The agreement was for Mr. Stockwell to take two weeks to scan those photos and then give them back. And the record is absolutely undisputed on that point, that the photos were given in May, that Mr. Bolio began asking for the photos back in August, and those requests were repeatedly refused. There are text messages about this. There are emails. There's testimony from Mr. Bolio that Mr. Stockwell does not dispute, that Stockwell said at one point, I might even keep these photos. You can't get them back from me. And then it took until October of 2016, after the lawsuit was filed, after trial, excuse me, trial counsel appeared at Mr. Stockwell's home, for Mr. Bolio to get any photos back at all. That is undisputed in the record. Well, I had actually the same question as Judge Grass, because it seems like that might be a pretty legitimate claim for the period of time where it was, you know, the so-called delayed return. But I didn't see where that was urged upon the district court and where the district court had an opportunity or did address it. So you're right, Your Honor, in the sense that the district court did not address this theory. But I'll point you to paragraphs 52 to 80 of the amended complaint. It's pages 11 to 15 of our addendum. And if you look at our opposition. Okay, yeah, that's more significant. If you listen to Mr. Stockwell's summary judgment, this is docket 199 at page 13, and I can read it for you if you'd like. Stockwell, encouraged by and working in conjunction with Sandvik and others, refused to return plaintiffs' original photos both at the end of the two-week period and even after repeated demands by plaintiffs and attorneys. That's from our opposition brief at summary judgment. It was part of the case below. I don't know why the district court didn't address it, but the district court's opinion focuses on really the question of whether there's continued conversion after October. And this may require us to take a closer look at it, but wasn't that really more buried in the other claim of, I still don't have all my photos back? I guess the amended complaint has a claim for conversion. And we don't need to plead theories in the amended complaint. We need to plead facts. And the facts in the amended complaint, paragraphs 52 to 80, are very clear that there are two aspects of conversion here. One is May to October, and the undisputed evidence in the record supports that claim. The second is after October continuing through today. Our position is there is also sufficient evidence in the record for a jury to find for plaintiff on that claim. But that's the focus of the district court's opinion, and I think the first, you know, the most basic error is that the district court didn't address this narrow claim that, as a matter of law, is conversion, in the sense that conversion happens when something is taken permanently or for an indefinite period. At the point when the photos weren't returned, it was indefinite. Given the district court's not addressing this issue, did you make any effort, I don't know, by Rule 59, Rule 60, motion for reconsideration or something like that to bring it to the court's attention? I wasn't trial counsel. I don't recall Rule 59 being at issue. When we got involved, we did ask the district court to certify an appeal to come up here, but I don't believe it was, and that was part of the claim, but I don't recall raising it after the opinion that the district court had failed to address that. You asked to certify a claim after the judgment? No, sorry, to certify an interlocutory appeal. We made a motion under 1292B to take an appeal. Some controlling issue? What did you cite as your basis of the 1292? The copyright infringement claim, Your Honor, which is the second claim I referred to at the beginning. That claim is... But it wasn't on this conversion? No, Your Honor, I don't think that there's a... So, counsel, the real answer to the question is nothing in the record shows that your client did anything to call to the court's attention that you didn't rule on this issue, right? Not that I'm aware of, Your Honor. Thank you, that was the answer, yeah. And if I can pivot a little bit to the copyright infringement claim, it's distinct from the conversion claim. I think there's a lot of overlap in terms of the facts, and sometimes it gets lost, but the copyright infringement claim is distinct. The court granted summary judgment on the copyright infringement claim because it found, as a matter of law, that the defendants had an implied license to distribute and copy 141 copyrighted images. But the existence and the scope of an implied license is a quintessential issue of fact. Courts only find there's an implied license in narrow circumstances, and they look to the totality of the circumstances. Here, the totality of the circumstances does not support an implied license as a matter of law. And I can point you to a few different reasons for that. The first is the express contracts between the parties. There are three of them, they're in the appendix, and they each specify that Mr. Bolio's retaining all of the rights to his photos, that he is granting distribution rights only in very limited circumstances, and in a one-off sentence. So the right to distribute on one occasion is not a blanket right to distribute. And I'll read to you from one of those contracts, the first one with Mr. Krause. It authorizes distribution of, quote, brief sections of chapters of the work in the media for purposes of publicizing the work. And I think that's important because you have to step back and realize that what the parties were doing here was a book project. And so even in that first contract, the limited authorization to distribute is in the context of a book, and it's limited to media promotion. What about all the e-mails he didn't respond to, all the notice that he clearly had of what was going on? So there are two e-mails he didn't respond to, Your Honor. I thought there was more than two, but you think there were just two? I think there were just two. There's April 22nd of 2016, and then there's a, quote, unquote, marketing plan in July of 2016. It is true Mr. Beaulieu didn't respond to those, but I think that's the defendant's best evidence that there was an implied license. But that's ultimately for a jury because when you look at the totality of the circumstances. Well, counsel, this is summary judgment. And, you know, there are many things we don't take to a jury, even though they are factual, factual, factual, because it's not really disputed. It's not material. Okay. Why aren't we in that situation in light of the e-mails? Sure. Three different categories, Your Honor. This is what the jury could have credited. Number one is the contracts themselves. They're written contracts that specify that there are not the distribution rights that would have been created by the implied license. That's strong evidence that there is no implied license. Number two is the course of dealing between the parties. The defendants repeatedly asked Mr. Beaulieu to expand the scope of the project, to do things like a gallery, to do things like sell the photos directly. He said no. Every time the record is clear, he says, I want to do a book and only a book. That would refute the idea of an implied license to distribute in order to do a gallery. Number three, I'd say the best evidence we have, an e-mail to someone who is not Mr. Beaulieu, is at pages 170 and 171 of the appendix. It's an e-mail from Mr. Stockwell to Doug Flanders, who's affiliated with a gallery. He has nothing to do with books whatsoever. And Stockwell writes, I could use some insight. I've never really put a show like this together before. Offering to meet Mr. Flanders at his gallery. And then if you flip to the next page, the press release that goes with what he sent to Mr. Flanders, there's a giant image at the top of gallery photos. There's nothing that looks like a book in this e-mail. There's no mention of a book in this e-mail. And what the e-mail, the press releases I'm calling an e-mail, says that what is on offer are decorative display images and fine art portraits for gallery exhibition. That's not a book project. That's an entirely separate project. And if you go back to the April 22nd e-mail, I grant you there is silence in response to it. I don't think that's a particularly persuasive fact, but it's a fact. But even the content of the e-mail is in conflict with what I just read to you to Mr. Flanders. That message on April 22nd focuses on a book. It's the lead bullet point of the draft press release that goes to Allen. The second bullet point that goes to Allen does refer to plans for a gallery show. But it doesn't say we're doing a gallery show. It doesn't say this press release is to promote our gallery show. I think that's in stark contrast to what comes later when what is being promoted, I think it's 13 different e-mails, is a gallery show. And I'd also point you, I mentioned Appendix 170 to 171. I'd say other good evidence of this is Appendix, I think it's 175 to 178. It's e-mails with a gentleman, Jeff Goldberg, who's described as a European art dealer. Again, nothing to do with the book, nothing to do with the book project. He gets a press release, draft press release, that says, before the rain holds the copyright to these photos. Before the rain is an LLC created by Mr. Stockwell without Mr. Beaulieu's knowledge. Again, the press release says, what's on offer are decorative display images and fine art portraits. There's no mention of a book project. Counsel, before your time's all gone, your opponents have a theme. No damages, no damages, no damages. They end about every argument with no damages. So would you address that? I would, Your Honor. At summary judgment, we didn't need to prove damages. It wasn't part of the case. Wait, counsel. Several of these say that it's part of the cause of action. Copyright and Minnesota basic law. Damages is one of the three or four things you've got to prove. Sure. And we're going to prove that, Your Honor. The point is that at summary judgment, there's evidence in the record to support damages. Okay. Tell me what that is. I'm trying to help you on time. Go ahead. Sure. The evidence in the record is that at the point when the photos were converted, Mr. Beaulieu lost the opportunity to pursue a book with a European publisher called Taschen. It's a high-end publisher. They had written Allen and said, let's do a book together. And he didn't have that opportunity because he didn't have his photos. On the copyright infringement claim, damage is presumed. It's part of a copyright violation that the unauthorized copying and distribution. But you still have to show a reasonable probability of damages, right? I don't. On the copyright claim, I'm not sure, Your Honor. U.S. Supreme Court kind of words it that way. I know it's confusing, but I think reasonable probability, existence, causal connection, infringement, any loss of revenue. I'm quoting U.S. Supreme Court here. Sure, Your Honor. There is. I believe there are statutory damages, though, that are available. And we have the right until trial to designate actual damages or statutory damages. I can't say for sure what we'll do when we go back to trial, but the Copyright Act gives us, I think it's up to $30,000 per infringement and up to $150,000 if that infringement is willful. I see my time has eaten into rebuttal. Thank you, Your Honor. Very well. Thank you. May it please the Court, my name is Edward Fox. I'm the attorney for the defendant Sandvik, counsel. Your Honor, I'd like to address two key points before I address some of the questions that were raised by Judge Benton. First of all, Mr. Sandvik is in a distinctly different position. He was not client of the book project. He was not one of the joint ventures. He was just one of the potential investors to whom they circulated the press release and the MP4 video. So there's only one claim against Mr. Sandvik that's raised on appeal. That's the conversion claim. And I want to raise two critical points about that. Number one, the record was undisputed below that the claim was that Mr. Sandvik somehow, quote, unquote, had possession or retained physical photographs. After exhaustive discovery, there was no evidence of that and it was conceded that he never had possession of any physical photographs. His possession required Minnesota law. Excuse me, Your Honor? His possession required Minnesota law. As far as the conversion claim that was addressed to Mr. Sandvik is concerned, it was required with respect to the Rule 12 motion. For this reason, at the Rule 12 motion, it was quite clear that you cannot convert intellectual property. So the court said with respect to your conversion claim against Mr. Sandvik, you can only have a claim if you can show that he had possession of the physical photographs. Because otherwise, there's no conversion claim under federal law. You'd have to go to your copyright claim. And a copyright claim was never asserted against Mr. Sandvik. So with respect to the conversion claim, they actually admit on page 10 of their reply brief, quote, the conversion claim does not apply to Mr. Sandvik, does not apply to him. So as far as the technical conversion claim is concerned, that's out with respect to Mr. Sandvik. Then secondly, the only other claim that they've got with respect to Sandvik is this, quote, unquote, civil conspiracy claim. And I want to emphasize to the court, and I believe that it was raised by Judge Grender, this conspiracy claim was never alleged in the verified complaint. And you cannot raise claims at the time of summary judgment or raise new claims on appeal in order to avoid summary judgment. So I don't think that the conspiracy claim is properly even addressed by this court. But even if you consider it, civil conspiracy is not an independent cause of action. It requires an underlying tort claim that Mr. Beaulieu cannot prove. Mr. Spence admitted at the summary judgment hearing that the inventory of the photos, quote, is a work in progress. And I go back to five, 500 or 5,000, it doesn't matter. So the numbers and the terms of what was returned and what wasn't returned, we don't know. Therefore, Judge Frank correctly ruled that without, and this is a quote from his order, without a verifiable inventory, it is mere speculation that Stockwell remains in possession of any missing photographs. The court finds Mr. Beaulieu's speculative allegation that Stockwell and or the co-defendants remain in possession of his photos is insufficient to survive summary judgment. And that was the whole key. They make questions here and issues here about Mr. Beaulieu's alleged credibility with respect to his inventory of his photo collection. But they leave out the critical part of the standard that it has to be, quote, unquote, without resort to speculation. And after exhaustive discovery, I was involved in most portions of the underlying litigation, the discovery period was extended four times. They had ample opportunity to address the issue. The whole question about the inventory was one of the central issues in discovery that they never successfully addressed. And even at the time of summary judgment, I will emphasize, even on this appeal, they still don't point to the evidence of the alleged inventory of the photo collection that was never returned. They simply can't do it and they never anywhere in their briefing point the court to that. Now, I want to address a couple of questions that I think were raised by Judge Benton. You're absolutely right with respect to the conversion claim. No matter how you slice it, you have to allege damages. And I would respectfully submit to the court that the, quote, unquote, gap claim that Judge Gras asked about, that was never asserted anywhere in the litigation. That didn't come up until after the summary judgment hearing. So with respect to the gap claim, it was never raised. But even if they contend that it was somehow raised in an indirect way, they never articulated in discovery any alleged damages with respect to the alleged gap claim. And I do want to point out to the court that there was originally an interference with prospective economic claim, prospective economic advantage claim against Mr. Sandvik. At the Rule 12 motion, that was dismissed by Judge Frank without prejudice to allow Mr. Bolio and his counsel to identify some specific opportunity that was lost and damages. They never did that. And in the summary judgment motion, we pointed out that they never addressed the issue that Judge Frank had left open. And then they conceded in their summary judgment papers in opposition to Mr. Sandvik's motion that they were withdrawing that claim. So I always thought that the claim was completely dismissed against everybody. But what I will say for sure is that there's no evidence in the record that ever shows any kind of a concrete prospective opportunity that was lost. And they certainly never anywhere articulated any damages with respect to that claim. Counselor, I believe that if they did raise the so-called gap claim, that nominal damages are available. Are they not? I'm not aware of Minnesota law that nominal damages would be available. And certainly, with respect to any type of a claim to have a meritorious claim for conversion, I think the old maxim is the law does not concern itself with trifles. This was not an issue where Mr. Bollier was compromised in any way with respect to this gap period. Because the whole issue was the book. Now, Judge Benton raised the question about the e-mails. And I would respectfully point the court. How many were there? How many e-mails did Mr. Bollier see? Well, Judge. He says more than two. He says two, and I thought it was more than two. Well, it was a lot more than two. So what I would point the court to, and you can actually find them in the Sandvik appendix. Yeah, but you're an attorney here. About how many do you think there were? There were at least six to eight during the pertinent time period. Yeah. So during the pertinent time period. And, again, I'm not going to quote them all. But I would point the court to the Sandvik appendix pages 160 to 163. Mr. Bollier himself is directing Mr. Kraus to circulate the press release and the MP4 video to Carleton Books. Because he says they want our book. And then Mr. Kraus is reporting to him on the outcome of the communications with Carleton Books in London. So the whole premise of their case was that somehow this press release and the MP4 video was itself the evidence of improper activity to misuse and exploit the photographs and infringe the copyright. But from 2015 to 2016, it actually became clear after we took his supplemental deposition that was compelled by the magistrate judge for failure to produce these e-mails in the first place, he admitted in his supplemental deposition. Is the MP file really just a slideshow, a fancy PowerPoint? I didn't catch it, Your Honor. Is the MP file really a fancy PowerPoint, a slideshow? No. What is it really? It's in the record. Tell me what it is in a sentence, please. If you just put it on the computer, it just scrolls through photographs. How many of them? I think there's 131. Thank you. And they're exactly the same photographs that are in the book, that were in the draft book. I want to leave some time for my co-counsel. The only other point that I want to raise, and I believe it was raised by Judge Grunder, they've got all of these theories, right, about, well, I lost this, I lost that, well, they violated my copyright infringement. There's no evidence of any of that. I mean, all of the stuff that they're claiming that they were injured by, we went through exhaustive discovery. There was exhaustive forensic analysis of 26 electronic devices. They went through everybody's e-mails, everybody's text messages, all kinds of hard copy documents, thousands of pages. There was not a whiff of any inappropriate activity to commercialize or exploit Mr. Bolio's photographs. None. And as we sit here today, six years after the fact, there is no evidence of any of that. So I would respectfully submit, particularly with respect to Mr. Sandvik, that Judge Frank correctly found that there was no basis, in fact, for the claims of conversion against Mr. Sandvik, and properly dismissed those on summary judgment.  Thank you. Mr. Pucklidge? May it please the Court, Counsel, my name is Mick Pucklidge, and I represent Mr. Stockwell on this matter. I would like to note for the record a couple things. There was a representation about multiple contracts. In the appendix, page 83, is the only agreement that was signed by Mr. Stockwell. That is not limited to any sort of a photographic book. It says that the production team shall use the digital files for production of the work, which may include some promotional and marketing uses. In this particular case, Mr. Fox accurately pointed out to the pages of the record in the appendix, I would like to note for the record that if the Court looks at appendix 154 to 163, 192 to 195, 240 to 243, is where they will see the evidence of the email communications between the parties discussing the back and forth and the sharing of the MP4 video. Now, with respect to the implied license that was provided in this case, counsel makes the argument that the implied license cannot be or somehow should be ignored because it was not verbally approved. But that is not what the implied license case law says that we have cited on our brief. In fact, courts can find and do find implied licenses where the copyright holder engages in conduct where the other property may infer consent. And an inference of the consent may include silence. And those cases are cited in our brief. In this particular case, as Mr. Fox correctly pointed out, not only was there expressed knowledge of what was going on and an acknowledgment that the MP4 was being shared, but also a request by Mr. Beaulieu to do so. Now, you can't avoid summary judgment just by saying somehow now I didn't know after you've already said in a deposition, you got the evidence, you saw it, you received it, and you did nothing. The court in this particular case noted actually in a footnote that those portions of the deposition transcript that do not and conflict with the affidavit, the affidavit has to be disregarded. A party can't create an issue on summary judgment by correcting the testimony or changing their testimony in an affidavit. In your brief, you say that there's no evidence that Stockwell sent the slideshow to anyone else after the relationship soured. The other side responds by pointing to an email from Stockwell to Jimmy Bowman on August 31, 2016, Exhibit 36, which identifies, the email identifies some attachments. And it's less than clear to me. Is the slideshow one of those attachments, do you know? I don't know. I don't think it was. I do think that the sending of the MP4 video was limited. If it crossed over in time at all, it was all done with respect to furtherance of any effort that the parties had. Because, your honors, this wasn't a case where Mr. Stockwell or Mr. Krauss or somebody went in and stole some photos from Mr. Bolio. These guys had been friends since high school. And this was an effort to try to monetize some photographs of prints that they had. It was a voluntarily joint venture that they entered into to try to do something with it. And it expanded beyond sort of the initial agreement that they lead you to believe controls all. That's not what happened in this case. And the evidence is patently clear. They can't run away from it. Now, we don't need to look at the four corners of a document when a joint venture gets expanded. A joint venture can be expanded beyond anything, just like any normal operating entity, like a limited liability company. So, counsel, a joint venture is a partnership under Minnesota law, right? Yes. Was this called a joint venture? That's the first time I've heard the term. Well, we call it a joint venture simply because What did the contract say, counsel, for starters? The contract says that they are a production team. It doesn't define legally what they are. Within the legal operations, I think it's probably the best definition would probably be a joint venture, maybe a partnership. Most states say that a joint venture is controlled by partnership law. Is Minnesota the same? Yes, it is. Proceed. Counsel, I'd like to ask you about your reference to precedent for the creation of an implied license through silence. Does any of that precedent involve an express written contract with contrary terms? Why should we disregard the written contract here by silence? I'm trying to think through the litany of cases that we cited. I don't think so. But with respect to that, Your Honor, the contract with Mr. Stockwell isn't so limited. The contract with Mr. Stockwell is on 883, and that has I see my time's up. You can finish up. That has no limitation with respect to just a book, a simple book. It's got the ability to have promotional materials, which is, that's all this was. With his approval? No, with approval of Distribution of marketing materials required his approval. It required approval of all. Including him? Including him. Through silence? Yes, that's what it says. Yeah, you can approve through silence. The law has been clear on that for, well, since 1994 when I went to law school. Thank you. Thank you, Mr. Pucklidge. Thank you, Your Honors. I want to start with where Mr. Fox began, and that is the claims against Mr. Sandvik. He is absolutely right. The only claim that we have against Mr. Sandvik relates to the conspiracy to convert claim. We don't claim Mr. Sandvik had actual possession of the photos. Our theory is that he conspired with the defendants to convert the photos. There is evidence of that in the record. It's pled in the complaint, and it's not waived. I'd point you to paragraphs 55 and 62 of the amended complaint, which actually use the word conspiracy and conspire to describe what Mr. Sandvik did, and count for conversion. It's not a separate claim, though, right? Is that what we're arguing about? It's not a separate, no. Count for is conversion. It's a separate theory of conversion. Right. Proceed. Okay. I want to touch on the damages point, because I think this is important. In appendix 50 and 51, Mr. Beaulieu's declaration, he describes the communication with the European publisher that happens right around the time when the conversion starts. That deal can't happen while his photos are gone. That's in the declaration. The e-mails are also in the record with the publisher. And counsel is correct. I think those e-mails are an interesting contrast with the other evidence in the record that shows defendants going behind Alan's back, not informing him about the distribution, sending e-mails with the slideshow and other photos to investors, who, by the way, have no business doing a book project, because you get an advance for a book project. That's different than what happens with this European publisher, where Alan says, I was approached. Will you guys talk to him? Will you get him what he needs? I think it's also notable that that set of e-mails is with a publisher. That makes sense in the context of a book project. And I'd point you to the July marketing e-mails, where there's this marketing plan. If you look at the list of outlets that the distribution is authorized to, NPR, Star Tribune, Amity Magazine, they're media publications. They're not gallery owners. They're not art dealers. They're not investors. Finally, I think for the copyright infringement claim, the key point here is that you only imply a license based on the totality of the evidence. On the one side, we have silence in response to some e-mails. We do have, at the beginning of the party's interaction, some e-mails between them. As against that, we have the written contracts. And I want to correct what my opposing counsel said. I'm going to point you to appendix page 83. Just read you this part of the contract. He said gives authority to distribute. What it says is that it authorizes some promotional and marketing uses at a later time to be approved by all members of the production team. That approval didn't happen here. That means, among all of the other totality of the circumstances, there was no implied license to distribute the copyrighted photos. Thank you, Your Honors. Thank you, Mr. DeLitt. Counsel, we appreciate your appearance and briefing. The case is submitted and we'll issue an opinion in due course.